Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/02/2020 09:09 AM CDT

State of Nebraska, appellee, v.
Jason D. Devers, appellant.

___ N.W.2d ___

Filed July 10, 2020.    No. S-19-629.

1. **Pretrial Procedure: Appeal and Error.** Trial courts have broad discretion with respect to sanctions involving discovery procedures, and their rulings thereon will not be reversed in the absence of an abuse of discretion.
2. **Appeal and Error.** Appellate courts do not generally consider arguments and theories raised for the first time on appeal.
3. **Trial: Waiver: Appeal and Error.** Failure to make a timely objection waives the right to assert prejudicial error on appeal.
4. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.
5. **Trial: Evidence: Appeal and Error.** A trial court's determination of the relevancy and admissibility of evidence must be upheld in the absence of an abuse of discretion.
6. **Trial: Evidence.** Balancing the probative value of evidence against the danger of unfair prejudice is within the discretion of the trial court.
7. ____: ____. Evidence that is irrelevant is inadmissible.
8. **Evidence.** Relevancy requires only that the probative value be something more than nothing.
9. **Rules of Evidence.** Under Neb. Rev. Stat. § 27-403 (Reissue 2016), relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.
10. **Evidence: Words and Phrases.** Unfair prejudice means an undue tendency to suggest a decision based on an improper basis.
11. ____: ____. Unfair prejudice speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground

different from proof specific to the offense charged, commonly on an emotional basis.

12. **Evidence: Corroboration: Testimony.** Evidence may be relevant because it corroborates other testimony.

13. **Criminal Law: Evidence.** The State is allowed to present a coherent picture of the facts of the crimes charged, and it may generally choose its evidence in so doing.

14. **Evidence.** Most, if not all, evidence offered by a party is calculated to be prejudicial to the opposing party.

15. **Jury Instructions.** In construing an individual jury instruction, the instruction should not be judged in artificial isolation but must be viewed in the context of the overall charge to the jury considered as a whole.

16. **Evidence: Words and Phrases.** Circumstantial evidence is not inherently less probative than direct evidence.

17. **Verdicts: Appeal and Error.** Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error, a guilty verdict surely would have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.

18. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

19. **Criminal Law: Aiding and Abetting: Intent: Other Acts.** One who intentionally aids and abets the commission of a crime may be responsible not only for the intended crime, if it is in fact committed, but also for other crimes which are committed as a natural and probable consequence of the intended criminal act.

20. **Effectiveness of Counsel: Appeal and Error.** In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.

21. ____: ____. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any

issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record.

22. ____: ____. Once issues of trial counsel's ineffective performance are properly raised, the appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims.

23. **Effectiveness of Counsel: Postconviction: Records: Appeal and Error.** In order to know whether the record is insufficient to address assertions on direct appeal that trial counsel was ineffective, appellate counsel must assign and argue deficiency with enough particularity (1) for an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) for a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court.

24. **Effectiveness of Counsel: Proof: Appeal and Error.** When a claim of ineffective assistance of trial counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel.

Appeal from the District Court for Douglas County: Timothy P. Burns, Judge. Affirmed.

Michael J. Wilson, of Berry Law Firm, for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Per Curiam.

## I. INTRODUCTION

Jason D. Devers appeals from convictions, pursuant to a jury verdict, for first degree felony murder and use of a firearm to commit a felony. We find no merit in his claims regarding the termination of a witness' deposition, admission of controlled substance and firearm evidence, and sufficiency of the evidence to support his intentions to commit robbery and use a

firearm. Further, he asserts 13 claims of ineffective assistance of trial counsel, but the three that we reach on direct appeal lack merit. We affirm.

## II. BACKGROUND

In the early morning hours of January 6, 2018, Kyle LeFlore was shot and killed outside of Reign Lounge, a bar and nightclub in Omaha, Nebraska. Following an investigation, Devers was arrested. The State filed an information charging him with first degree felony murder,[1] use of a deadly weapon to commit a felony,[2] and possession of a deadly weapon by a prohibited person.[3]

Before delving into the proceedings, a brief summary of the surrounding events is necessary. In accordance with our standard of review, we synopsize them in the light most favorable to the State.

On the evening of January 5, 2018, Devers and Larry Goynes went to Reign Lounge. At some point during the evening, Devers told Goynes that he knew of a "lick" (target for robbery). Sometime past midnight, Devers and Goynes left and sat in Devers' vehicle in the parking lot. Goynes received a message that LeFlore was leaving. Goynes got out of the vehicle, and Devers drove off. Goynes attempted to rob LeFlore, but LeFlore fought back. Goynes shot LeFlore and stole his jewelry. Later that morning, LeFlore died. After shooting LeFlore, Goynes ran down the street to where Devers had moved his vehicle and got in. Following an investigation, law enforcement authorities suspected Devers and Goynes of the murder. During several searches pursuant to warrants, the authorities found a firearm linked to Devers and Goynes and found controlled substances and ammunition in Devers' home.

---

[1] Neb. Rev. Stat. § 28-303(2) (Cum. Supp. 2018).

[2] Neb. Rev. Stat. § 28-1205(1)(a) and (c) (Reissue 2016).

[3] Neb. Rev. Stat. § 28-1206(1)(a) and (3)(b) (Supp. 2017).

## 1. Pretrial

### (a) Motions in Limine

#### (i) Piya Milton's Deposition

Prior to trial, Devers moved to take the deposition of Piya Milton, a witness for the State. The district court granted the motion and ordered that it take place on August 9, 2018. It entered a similar order in a companion case pertaining to Latiba Lemon.

At the deposition, with Devers' counsel present, Milton refused to answer questions, claiming that her life would be in danger if she did. The court was asked to intervene. After Milton informed the court of her belief, the court ordered the deposition to be discontinued and appointed counsel for Milton. The court stated that after Milton received counsel, Devers would be free to file another motion to take Milton's deposition. At that time, the State indicated that it would not object.

Instead of filing another motion to depose Milton, Devers filed a motion in limine asking the court to prohibit the State from calling Milton as a witness, based upon her refusal to cooperate at the deposition. The court's order overruling the motion recounted the events and reiterated that Devers was free to file an additional motion to take Milton's deposition. Devers did not do so.

#### (ii) Firearms and Controlled Substances

Devers filed a separate motion in limine to prohibit the introduction of several items of evidence, including "[a]ny evidence regarding firearms that were recovered and alleged to have been used in the homicide of . . . Le[F]lore [and a]ny evidence regarding [controlled substances] that were recovered from [Devers'] residence on January 6, 2018, pursuant to search warrant."

The district court overruled the motion in limine regarding the evidence related to a firearm, stating that it "[could not] make a pretrial ruling on it because it'll depend on how the evidence comes in." The State argued that the evidence regarding controlled substances found in Devers' home was relevant to corroborate the testimony of a jailhouse informant. Regarding the controlled substances, the court took the matter under advisement.

### (b) Motion to Dismiss

Devers filed a pro se motion to dismiss, alleging a violation of his rights to a speedy trial under Neb. Rev. Stat. §§ 29-1207 and 29-1208 (Reissue 2016) and under the Sixth Amendment to the U.S. Constitution. The court overruled his motion. The court's order discussed the respective claims.

Regarding the statutory claim, the court calculated that Devers' motion for discovery, motion to take Milton's deposition, and requested continuance resulted in 108 days of excludable time. This, the court explained, extended Devers' trial date several months beyond the date on which he had filed his motion to dismiss. It noted that Devers' motion for discovery alone, which excluded only 4 days, was sufficient to defeat his motion to dismiss.

As to the constitutional claim, the court applied the balancing test from *State v. Johnson*.[4] It noted that Devers' trial was scheduled to begin less than a year from the date of the offense. Devers' counsel, the court explained, "has done anything any other criminal defense attorney would have done." It reasoned that "if Devers' counsel was not allowed the time to properly prepare for trial, Devers, in the event he was convicted, would [argue] later in a postconviction motion that he did not receive the effective assistance of counsel." The court found that Devers had not shown unreasonable delay in bringing him to trial, or that he was prejudiced.

---

[4] *State v. Johnson*, 298 Neb. 491, 904 N.W.2d 714 (2017).

## 2. Trial

### (a) Reign Lounge Events

We now summarize the evidence presented at trial regarding the events of January 5 and 6, 2018, relevant to the assignments of error asserted on appeal.

### (i) Milton

Prior to discussing the incident, Milton testified that she had been diagnosed with bipolar depression and, on the night of the incident, was on medication. We now summarize her testimony regarding the events that night.

On the evening of January 5, 2018, Milton drove herself and two friends to Reign Lounge. Around 10:15 p.m., they arrived. They left their jackets in Milton's vehicle, and she gave her car keys to one of her friends.

At about 1 o'clock the following morning, Milton had an altercation with another woman. A security guard "pick[ed] [her] up and took [her] out" of the club. The guard refused to allow Milton to retrieve her car keys. She was then outside for 15 to 20 minutes in below-zero temperatures without her jacket or keys.

While Milton was outside, she heard a man calling her name. The man got out of the passenger's seat of a maroon sport utility vehicle (SUV), walked toward her, asked if she remembered him, and said he knew her child's father. After Milton talked to the man, he invited her to warm up in his vehicle. Milton got into the vehicle and sat behind the passenger's seat. She described the vehicle as "a maroon truck" that was a smaller SUV than her vehicle.

Once in the maroon SUV, the man sat in the passenger's seat, and there was another man in the driver's seat. The man in the passenger's seat identified himself as "Ratchet." She described Ratchet as "heavyset, low cut, brown skin." Milton identified a picture of Goynes in evidence as depicting Ratchet. She described the driver as "a dark skin dude with a black coat on with braids, or dreads." She identified the driver as Devers.

After Goynes and Milton discussed why she had been kicked out of the club, he showed her a black gun. According to Milton, "[i]t was readily apparent that he was armed with a firearm" and "[h]e had it out the whole time." Around 1:55 a.m., Goynes received a call or text message; said, "'Right now, right now'"; and jumped out of the maroon SUV. After Goynes jumped out, Devers drove away. At that point, Milton asked to leave the vehicle, and Devers said, "'You can't go out right now.'" Devers drove for a while and then parked by "a whole bunch of trees."

Devers and Milton remained parked for about 20 minutes. While they were parked, Devers identified himself as "'Little Pockets.'" Milton asked to be returned to Reign Lounge, and Devers stated, "'We can't go over there right now.'" After another 10 minutes, Milton saw Goynes running to the maroon SUV.

Once Goynes was in the vehicle, Devers asked, "'What did you get?'" Goynes responded, "'He really didn't have nothing.'" Milton testified that "[Goynes] said that [LeFlore] wouldn't give up nothing so [Goynes] had to shoot him." Devers asked, "'You didn't get nothing?'" In response, Goynes held up "these little chains," and Devers asked, "'Can I get one?'" Devers took one of the chains and put it around his neck. Milton stated that she did not know which chain Devers took but that she knew one chain had a cross on it.

Devers then drove off, and Milton asked to be taken back to Reign Lounge. Devers responded, "'No. I can't go over there.'" Devers drove them to Lemon's home and told Goynes to "go in there and hide something, take his clothes off and go take a bath, or something like that." Devers further told Goynes, "'I'll get rid of something for you,'" but Milton was unsure what it was. Goynes got out of the vehicle and did not come back.

Devers then drove Milton back to Reign Lounge. While he dropped her off, she put his cell phone number in her own cell phone under the name "Pockets." Due to police presence,

Milton was unable to retrieve her vehicle. Milton called Devers, and he picked up Milton and her friends. After Devers dropped off Milton's friends at home, he drove Milton to his home to sell her marijuana and then drove her home.

Several days after the incident, Milton communicated with a family member of LeFlore's. LeFlore's family recorded the conversation. Five days after the events, a homicide detective interviewed Milton. Milton signed a consent form allowing the police to search her cell phone.

### (ii) Marvin Stockdale

Marvin Stockdale, a jailhouse informant, testified about conversations he had with Devers in the Douglas County Correctional Center. Stockdale informed the jury that he was interviewed by law enforcement as a jailhouse informant in two cases, one of which pertained to Devers. At the time of trial, Stockdale was facing several charges and potential imprisonment of 73 years.

After becoming Stockdale's cellmate, Devers discussed the incident with Stockdale. At or near the time of the conversation with Devers, Stockdale took notes. At trial, Stockdale's notes were read verbatim to the jury. Here, we briefly summarize his testimony.

Devers told Stockdale that on the evening of the incident, he started out at a gas station selling "ecstasy pills" to some "girls." The girls were heading to Reign Lounge, and Devers told them he would be there later. Devers went to Reign Lounge with Goynes. When Devers arrived at Reign Lounge, he found the girls from the gas station. He explained that "the Army dude" offered to buy the girls drinks and that the girls then started talking to "the Army dude."

Devers said that he felt it was rude the girls stopped paying attention to him and that he went looking for Goynes. Devers found Goynes and told Goynes that "he had a lick for him." Stockdale explained that a "lick" means a target for robbery. Goynes asked, "'Where?'" Devers pointed to "the Army

dude," who, Devers said, had a "big wad of cash." Devers told Goynes that he did not care about the money and that he just wanted "the Army dude['s]" jewelry. Devers said, "'I just didn't think my little cousin stupid ass would kill him. . . . I told him to shoot if he act up, but damn.'"

Devers then jumped forward in the story and said that he picked up Goynes "on the corner." Devers stated that he was in the driver's seat and that Milton was in the back seat. Devers explained that Milton got into his vehicle because it was cold outside. Stockdale testified that he did not know Milton and had never had a conversation with her.

### (iii) Michael Sullivan

Michael Sullivan, another jailhouse informant, testified regarding conversations he had with Devers in the Douglas County Correctional Center. Sullivan explained that he did not prod for information; rather, Devers just kept talking. Sullivan also took notes of these conversations.

After a month of their being in jail together, Devers told Sullivan about his charges. Sullivan said, "'They must think you're the shooter.'" Devers responded, "'No. I was the driver.'"

A few weeks later, after Devers returned from a meeting with his counsel, he and Sullivan discussed Devers' case again. Devers stated that he was going to trial and that the main witness was his "brother's baby's mom," because she overheard him talking about a "lick." Sullivan testified that he understood a "lick" to mean a robbery of a drug dealer.

During their last conversation, Devers told Sullivan, "'I was selling "X" at the club. I was walking around with baggies in my hand. I think they got me on camera. I'm pretty sure they did. They got me on camera, so they got me.'"

### (b) Search of Devers' Home

At trial, evidence was presented regarding controlled substances found during a search of Devers' home. We summarize that evidence.

### (i) Aaron Hanson

Aaron Hanson, a sergeant of the Omaha Police Department, testified about the search. Hanson obtained a search warrant for a North 40th Street residence in Omaha (Devers' home). The warrant authorized law enforcement to search for firearms and narcotics.

On the evening of January 6, 2018, Hanson and other officers executed the search warrant. At that time, four individuals were at the home, including Kenvaughn Glass. Law enforcement did not find a firearm but found 9-mm and .22-caliber ammunition.

Before the State could present evidence of narcotics found during the search, Devers renewed his motion in limine. The district court overruled the renewed motion, granted Devers a continuing objection, and gave the following limiting instruction to the jury:

> Members of the jury, this evidence of the seized controlled substance, marijuana, located at [Devers' home] is received for the limited purpose of the potential or the possibility of corroborating the testimony of . . . Milton or a later witness . . . Stockdale. You must consider the evidence only for that limited purpose and no other.

Hanson testified that during the search, law enforcement found synthetic marijuana, methamphetamine, and drug packaging materials.

### (ii) Jailhouse Informants

Stockdale stated that Devers discussed the search of his home. Devers stated that law enforcement found "some drugs." Stockdale did not remember what kind of drugs Devers said were found.

Sullivan stated that Devers discussed the search. According to Sullivan, Devers stated that law enforcement found "K-2." Sullivan explained that "K-2" is synthetic marijuana.

### (iii) Patricia Smith

Patricia Smith, the mother of Devers' children, testified at trial. She testified that in January 2018, she lived at the same address as Devers' home. At the time, Devers, who had his own set of keys, was staying at the house because Smith's 7-month-old child had been admitted to the hospital. Smith stated that she did not know that narcotics, firearms, or ammunition were in her home.

Smith additionally testified that Devers was a "family person who spen[t] a lot of time with . . . his family" and that Kenvaughn came over to her home often.

### (c) Search at Benson Towers

At trial, the State also presented evidence regarding a firearm linked to the murder.

### (i) Chae Glass

Chae Glass, a juvenile detention specialist at the Douglas County Youth Center, testified regarding a firearm that was found at Benson Towers. Chae was an adopted cousin of LeFlore's and a maternal uncle to Kenvaughn and Shydale Glass. Devers is a paternal uncle to Kenvaughn and Shydale.

On January 6, 2018, Shydale established contact with Chae. Chae picked up Shydale and drove him to Chae's sister's home. On their way, Shydale told Chae to stop and pick up Kenvaughn.

While in his sister's home, Chae saw Kenvaughn and Shydale in the bathroom wiping down a firearm with a T-shirt. Chae described the firearm as a chrome and black handgun. After the bathroom observation, Chae did not see either Shydale or Kenvaughn with the firearm. But he stated, "[T]here was a lot of, you know, interchanging going on under the shirt, you know what I'm saying, hiding it."

Chae then drove Kenvaughn and Shydale to Benson Towers. Once at Benson Towers, Chae dropped off Kenvaughn and Shydale and drove a couple of blocks away to make a call

to the 911 emergency dispatch service. Chae instructed the police to pull him over.

### (ii) Hanson

Hanson testified about a search of an apartment at Benson Towers that led to the seizure of a firearm linked to the murder.

On January 6, 2018, at the end of Hanson's shift, he received information that led him to Benson Towers. Hanson became aware that Kenvaughn and Devers were related. Hanson began looking for a familial connection to Kenvaughn at Benson Towers. Based upon information from other officers, Hanson found that Kenvaughn was related to Wendy Williams, a Benson Towers resident.

The next morning, Hanson and other officers went to Williams' apartment in Benson Towers for a "knock and talk," and at the apartment, Williams' roommate answered the door and allowed law enforcement to enter. Shanequa Dismuke was also present. During the "knock and talk," Hanson found unlawful items and another officer drafted a search warrant affidavit.

Law enforcement received a warrant and was allowed to search for narcotics and firearms. During the search, law enforcement personnel found and opened a safe. Hanson testified that they found two 9-mm firearms and multiple packages of marijuana.

At trial, after Hanson disclosed the contents of the safe, a sidebar was held and the court explained that the testimony must be limited to the firearm that was found wrapped in a T-shirt. Devers renewed his motion in limine and requested a continuing objection. The court granted the continuing objection.

Hanson clarified that one of the 9-mm firearms belonged to Dismuke and that the other was found wrapped in a T-shirt. He confirmed that the 9-mm ammunition seized from Devers' home could be fired by the T-shirt-wrapped firearm found at Benson Towers.

### 3. Final Jury
#### Instructions

The final jury instructions contained a specific instruction regarding the evidence of controlled substances found during the search of Devers' home: "The evidence of the seized controlled substances located at [Devers' home] was received for the limited purpose of the potential or the possibility of corroborating the testimony of . . . Milton, . . . Stockdale, and . . . Sullivan. You must consider this evidence only for that limited purpose, and no other."

### 4. Verdict and
#### Sentences

The jury found Devers not guilty of possession of a deadly weapon by a prohibited person. The jury found him guilty of first degree felony murder and use of a deadly weapon to commit a felony. The district court sentenced Devers to life imprisonment for first degree murder and 5 to 5 years' imprisonment for use of a deadly weapon. The sentences imposed were to run consecutively.

Devers filed a timely appeal, in which he is represented by different counsel than at trial.

## III. ASSIGNMENTS OF ERROR

Devers assigns, reordered and restated, that the district court (1) abused its discretion when it terminated the deposition of Milton and overruled his motion in limine to exclude Milton's testimony and (2) erred in admitting irrelevant and unfairly prejudicial testimony regarding (a) the controlled substances found during a search of his home and (b) the firearm found at Benson Towers. He also assigns that (3) the evidence was insufficient to convict him of first degree felony murder and use of a deadly weapon, because a trier of fact could not find (a) that Devers knew in advance that Goynes intended to rob LeFlore and (b) that Devers knew in advance that Goynes intended to use a firearm.

In compliance with our decision in *State v. Mrza*,[5] Devers assigned 13 claims of ineffective assistance of trial counsel. Twelve claims asserted trial counsel performed deficiently by failing to

- "object to the trial court's erroneous limiting instruction regarding the drug testimony by Hanson";
- "submit evidence in support of [Devers' pro se] motion [to dismiss on constitutional speedy trial grounds] and . . . file an interlocutory appeal of the trial court's order denying dismissal";
- "present testimony from Corrections Officer Hall, who would have testified that Devers resisted having Stockdale as a cellmate because Devers knew Stockdale would use the cell assignment as an opportunity to fabricate incriminating statements by Devers";
- "present testimony from Joequana Goynes, . . . Lemon, and Teosha Valentine, who would have testified that Milton admitted (1) that Devers did not knowingly aid in the robbery, (2) that prosecutors coached her testimony, and (3) that prosecutors threatened prosecution of Milton if she did not comply";
- "present testimony from . . . Sullivan's father, Michael Sullivan, Sr., who would have testified that Sullivan admitted to him that he lied to police about his conversations with Devers, and that he received off-the-record promises of leniency in exchange for testifying";
- "present testimony from Corey Finley, who would have testified that he observed Devers in the area of 25th and Fort Streets at the time of the shooting";
- "present testimony from Emmanuel Jackson and Kaleena Johnson, who both would have testified that . . . Stockdale admitted that he lied to police about his conversations with Devers, and that he received off-the-record promises of leniency in exchange for testifying";

---

[5] *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019).

- "investigate or present testimony from Kenvaughn and Shydale . . . , who both would have testified that the handgun seen in their possession by Chae . . . had no connection to Devers or Goynes, and that they were coerced into remaining silent";
- "obtain or present the recording of Milton made by LeFlore's family members on January 11, 2019";
- "consult or call as a witness an expert in pharmacology who would have testified that, on both January 6, 2018 and at the time of trial, Milton's prescriptions affected her ability to both accurately form and recall memories";
- "consult with, or call as a witness, an independent telecommunications expert because he or she would have testified that the cell phone evidence did not support the State's theory as to Devers' and Milton's movements on January 5-6, 2019, but instead was either inconclusive or directly refuted Special Agent Kevin Hoyland's testimony and demonstrative exhibit"; and
- "investigate and bring to the attention of the trial court and/or the jury the prosecutors' use of malicious prosecution tactics against . . . Smith to coerce her testimony against Devers."

The last claim asserted that trial counsel "not only . . . provided unreasonable advice that Devers should waive his right to testify, but . . . interfered with Devers' freedom to decide whether to testify by telling Devers he must abide by [counsel's] advice not to testify."

## IV. ANALYSIS

### 1. DEPOSITION SANCTIONS

#### (a) Standard of Review

[1] Trial courts have broad discretion with respect to sanctions involving discovery procedures, and their rulings thereon will not be reversed in the absence of an abuse of discretion.[6]

---

[6] *State v. Sierra*, 305 Neb. 249, 939 N.W.2d 808 (2020).

(b) Discussion

Devers argues that the district court abused its discretion when it terminated Milton's deposition and denied Devers' motion in limine to exclude her as a witness. He contends that there are no rules governing depositions that allow a party to bring the trial judge to terminate the deposition. He further contends that because Milton refused to testify at the deposition, the court abused its discretion in denying the motion in limine.

[2,3] Devers' first argument—concerning the lack of discovery rules allowing a judge to terminate a deposition—was not raised to the district court. Appellate courts do not generally consider arguments and theories raised for the first time on appeal.[7] And, as noted by the State, when the district court terminated the deposition, Devers failed to object. Failure to make a timely objection waives the right to assert prejudicial error on appeal.[8] Because Devers failed to object to the termination of the deposition and did not raise the termination argument during his motion in limine hearing, we will not address this argument.

Regarding Devers' second argument, the district court entered an order in compliance with its statutory powers. Pursuant to a criminal discovery statute, Devers filed a motion to take Milton's deposition.[9] During the deposition, Milton refused to answer questions over concerns for her safety and the district court terminated the deposition. Under another criminal discovery statute, when a party fails to comply with criminal discovery procedures, including the statute authorizing depositions, "the court may"[10] either "[p]rohibit the party from calling a witness not disclosed or introducing in evidence the

---

[7] *State v. Uhing*, 301 Neb. 768, 919 N.W.2d 909 (2018).

[8] *State v. Swindle*, 300 Neb. 734, 915 N.W.2d 795 (2018).

[9] See Neb. Rev. Stat. § 29-1917 (Reissue 2016).

[10] Neb. Rev. Stat. § 29-1919 (Reissue 2016).

material not disclosed"[11] or "[e]nter such other order as it deems just under the circumstances."[12] In the district court's order, it specifically stated that "Devers [was] free to file an additional motion to take [Milton's] deposition . . . ." Because the court's order was entered in November 2018 and trial occurred in March 2019, significant time remained in which to depose Milton again. Under these circumstances, we agree with the district court that authorizing a second deposition was a sufficient remedy. Accordingly, the district court did not abuse its discretion in denying Devers' motion in limine.

## 2. Relevancy and Unfair Prejudice

### (a) Standard of Review

[4-6] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[13] A trial court's determination of the relevancy and admissibility of evidence must be upheld in the absence of an abuse of discretion.[14] Balancing the probative value of evidence against the danger of unfair prejudice is within the discretion of the trial court.[15]

### (b) Discussion

Because both of Devers' assignments asserting error in the admission of evidence are based on relevancy and unfair prejudice, we recall general applicable principles.

[7,8] Evidence that is irrelevant is inadmissible.[16] "Relevant evidence means evidence having any tendency to make the

---

[11] § 29-1919(3).

[12] § 29-1919(4).

[13] *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020).

[14] *State v. Carpenter*, 293 Neb. 860, 880 N.W.2d 630 (2016).

[15] *State v. Thomas*, 303 Neb. 964, 932 N.W.2d 713 (2019).

[16] Neb. Rev. Stat. § 27-402 (Reissue 2016); *State v. Brown*, 302 Neb. 53, 921 N.W.2d 804 (2019).

existence of any fact that is of consequence to the deter-
mination of the action more probable or less probable than it
would be without the evidence."[17] Relevancy requires only that
the probative value be something more than nothing.[18]

[9-11] Under Neb. Rev. Stat. § 27-403 (Reissue 2016),
relevant evidence may be excluded if its probative value is
substantially outweighed by the danger of unfair prejudice.[19]
Unfair prejudice means an undue tendency to suggest a deci-
sion based on an improper basis.[20] Unfair prejudice speaks
to the capacity of some concededly relevant evidence to lure
the fact finder into declaring guilt on a ground different from
proof specific to the offense charged, commonly on an emo-
tional basis.[21]

### (i) Controlled Substances

Devers makes two arguments concerning the admission of
controlled substances seized from the search of his home.
Neither is persuasive.

First, he argues that evidence of methamphetamine, syn-
thetic marijuana, and packaging materials had little to no
probative value. Second, he argues that the minimal probative
value of the drug evidence was substantially outweighed by the
danger that the jury believed him to be a "trafficker of danger-
ous narcotics."[22] And, he asserts, the court's attempt to cure the
problem by means of a contemporaneous limiting instruction
did not encompass all of the target evidence, and consequently,
he "suffered the full prejudicial effects of this wrongly admit-
ted evidence."[23] We disagree.

---

[17] Neb. Rev. Stat. § 27-401 (Reissue 2016).

[18] *State v. Brown, supra* note 16.

[19] *Id*.

[20] *Id*.

[21] *Id*.

[22] Brief for appellant at 19.

[23] *Id*. at 20.

[12,13] Contrary to Devers' first argument, the admission of the testimony regarding controlled substances was relevant to corroborate the testimony of Milton, Stockdale, and Sullivan. We have recognized that evidence may be relevant because it corroborates other testimony.[24] This follows from a broader principle: The State is allowed to present a coherent picture of the facts of the crimes charged, and it may generally choose its evidence in so doing.[25] Hanson testified that during the search of Devers' home, law enforcement seized synthetic marijuana, methamphetamine, and packaging materials. Milton testified that on the night of the incident, she purchased marijuana from Devers. Stockdale testified that during his conversations with Devers, Devers stated that his house was searched and that drugs were found. And Devers told Sullivan that law enforcement seized "K-2" from Devers' home. The evidence was relevant to corroborate the testimony of an eyewitness and jailhouse informants. In other words, the evidence had substantial probative value to corroborate both Milton's testimony that she was with Devers the night of the incident and Devers' statements to Stockdale and Sullivan about the incident.

[14,15] Nor was the evidence's probative value substantially outweighed by unfair prejudice. Most, if not all, evidence offered by a party is calculated to be prejudicial to the opposing party.[26] But the court's limiting instruction restricted the use of the evidence only to corroborate the testimony of Milton, Stockdale, and Sullivan. Although the court's initial limiting instruction, given contemporaneously with Hanson's testimony, referred only to evidence of "marijuana," the court's final jury instructions broadly encompassed the "evidence of seized controlled substances located at [Devers' home]." In construing an individual jury instruction, the instruction should not be judged in artificial isolation but must be viewed

---

[24] See *State v. Freemont*, 284 Neb. 179, 817 N.W.2d 277 (2012).

[25] *Id*.

[26] *State v. Thomas, supra* note 15.

in the context of the overall charge to the jury considered as a whole.[27] Here, the situation resembled that in another case where we said, "The district court's limiting instruction restricted the jury's use of the evidence and minimized the tendency to suggest a decision on an improper basis."[28] Based on the limiting instructions, taken as whole, we cannot say that the district court abused its discretion in admitting the evidence of controlled substances.

### (ii) Firearm

Devers makes two arguments concerning the admission of the firearm seized at Benson Towers. First, he argues that the firearm evidence had minimal probative value and was substantially outweighed by the danger of unfair prejudice, because "the State introduced little, if any, evidence establishing a direct connection between Devers and the handgun . . . at the Benson Towers."[29] Second, he argues that the prosecutor elicited testimony from Hanson about "'multiple packages of marijuana'" found in the safe that served only to confuse the issues and unfairly prejudice Devers.[30]

To support the first argument, Devers relies upon *State v. Sellers*.[31] There, the defendant argued that the district court should have admitted the evidence of a handgun seized during the search of the victim. After unsuccessful attempts to serve the victim with a subpoena, the victim was arrested. At the home where the arrest occurred, law enforcement conducted a search and seized several items, including firearms. The district court granted the State's motion in limine to exclude admission of firearm evidence. On appeal, we reasoned that the probative value of the firearms seized at the arrest was minimal.

---

[27] *State v. Ely*, 295 Neb. 607, 889 N.W.2d 377 (2017).

[28] See *State v. Perrigo*, 244 Neb. 990, 1001, 510 N.W.2d 304, 311 (1994).

[29] Brief for appellant at 28.

[30] *Id*.

[31] *State v. Sellers*, 279 Neb. 220, 777 N.W.2d 779 (2010).

There was no proof linking the victim to the handgun, and law enforcement personnel testified that they could not place the handgun as having been in the victim's possession. We concluded that the minimal probative value was outweighed by the danger of prejudice.

Here, however, the State relied upon circumstantial evidence to connect Devers to the firearm seized at Benson Towers. Milton stated that after the incident, Devers drove Goynes to Lemon's house and that Devers told Goynes that Devers would get rid of something for Goynes. It was known that Devers spent a lot of time with family, including Kenvaughn. The next day, Chae picked up Kenvaughn and Shydale and took them to their mother's home. Chae saw them wipe down a firearm with a T-shirt. Chae then drove Kenvaughn and Shydale to Benson Towers. Later that evening, Kenvaughn was at Devers' home when law enforcement executed the search warrant. The following morning, law enforcement received a search warrant for an apartment with a family connection to Kenvaughn and Shydale. Law enforcement seized a handgun wrapped in a T-shirt. Milton described the handgun as black, Chae described the handgun as chrome and black, and Hanson stated that the ammunition found at Devers' home could be fired by the handgun found at Benson Towers.

[16] Devers contends that the circumstantial nature of the firearm evidence had minimal probative value and therefore prejudiced him. Circumstantial evidence is not inherently less probative than direct evidence.[32] Unlike the situation in *Sellers*, the temporal proximity from the shooting to the seizure of the firearm increased the probative value of the circumstantial evidence.[33] And, here, the evidence of the firearm was relevant to the crimes charged. We cannot say that the circumstantial evidence of the firearm was substantially outweighed by the danger of unfair prejudice. Accordingly, the

---

[32] See *State v. Thelen*, 305 Neb. 334, 940 N.W.2d 259 (2020).

[33] See *State v. Sellers, supra* note 31.

district court did not abuse its discretion in admitting evidence of the firearm.

[17] Regarding Devers' second argument, assuming without deciding that admission of the statement about "multiple packages of marijuana" seized in the safe with the firearm was error, we conclude the error was harmless. Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error, a guilty verdict surely would have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.[34] In the entirety of the trial, the challenged testimony represented only a single isolated statement. Here, the guilty verdicts were surely unattributable to this sole reference. Any error in admitting that evidence was harmless.

### 3. Sufficiency of Evidence

#### (a) Standard of Review

[18] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[35]

#### (b) Discussion

##### (i) Intent to Commit Robbery

Devers argues that the jury could not have found him guilty of first degree felony murder, because there was insufficient

---

[34] *State v. Dady*, 304 Neb. 649, 936 N.W.2d 486 (2019).

[35] *State v. Montoya*, 305 Neb. 581, 941 N.W.2d 474 (2020).

evidence to support that Devers "'intended that the crime be committed[,] or [Devers] knew that the other person intended to commit the crime[,] or [Devers] expected the other person to commit the crime.'"[36] He contends that Milton's testimony was not credible because a security guard did not identify Devers as the driver of the vehicle and that video surveillance footage inside Reign Lounge "did not confirm many of Stockdale's claims."[37] This, however, merely invites us to pass on credibility or reweigh the evidence. We decline to do so.

The evidence adduced at trial showed Devers knew Goynes intended to commit robbery. Because the testimony showed Devers turned Goynes on to the "lick," refused to return to Reign Lounge while Goynes was gone, implicitly understood why Goynes left the vehicle, and waited for Goynes to return, there was sufficient evidence for the jury to find Devers intended, knew, or expected Goynes to commit the robbery. Viewed in the light most favorable to the prosecution, there was sufficient evidence for any rational trier of fact to find Devers guilty beyond a reasonable doubt.

### (ii) Intent to Use
### Firearm

Devers argues that the jury could not have found him guilty of use of a firearm to commit a felony. He argues that Milton's "evidence that Devers was present in the vehicle outside Reign Lounge such that he had an opportunity to know that Goynes both intended to rob LeFlore and intended to use a firearm to do so"[38] was insufficient to support his conviction.

The record shows sufficient evidence that Devers knew Goynes intended to use a firearm to commit the robbery.

---

[36] Brief for apellant at 38.

[37] *Id.* at 39.

[38] *Id.*

Stockdale testified that Devers said, "'I just didn't think my little cousin stupid ass would kill him. . . . I told him to shoot if he act up, but damn.'" Milton agreed that when she was in the vehicle with Devers and Goynes, it was readily apparent that Goynes was armed with a firearm, and she testified that he "had it out the whole time." This evidence alone is sufficient.

[19] Based on Nebraska's aiding and abetting statute,[39] the State argues an alternative theory that the reasoning in *State v. McClain*,[40] which in turn relies upon *State v. Mantich*,[41] applies here. In *Mantich*, we explained that "one who intentionally aids and abets the commission of a crime may be responsible not only for the intended crime, if it is in fact committed, but also for other crimes which are committed as a natural and probable consequence of the intended criminal act."[42] There, we determined that using a firearm was a natural and probable consequence of kidnapping, robbing, and terrorizing the victim. And as an aider or abettor of the criminal acts, the defendant could properly be convicted of using a firearm to commit a felony "even if the jury believed that [the defendant] was unarmed."[43]

The same reasoning applies here. The record shows that the State prosecuted Devers as an aider and abettor. Devers intended to rob LeFlore, Goynes shot and robbed LeFlore, Devers aided Goynes by driving the vehicle, and LeFlore died of his wounds. Use of the firearm in the commission of the murder was a natural and probable consequence of the intended act of robbery. Considered in the light most favorable to the prosecution, the evidence was sufficient for any rational trier of fact to find Devers guilty.

---

[39] See Neb. Rev. Stat. § 28-206 (Reissue 2016).

[40] *State v. McClain*, 285 Neb. 537, 827 N.W.2d 814 (2013).

[41] *State v. Mantich*, 249 Neb. 311, 543 N.W.2d 181 (1996).

[42] *Id*. at 327, 543 N.W.2d at 193.

[43] *Id*. at 328, 543 N.W.2d at 193.

## 4. Ineffective Assistance of Counsel

### (a) Standard of Review

[20] In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.[44]

### (b) Legal Framework

[21,22] When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record.[45] Once raised, the appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims.[46]

[23,24] In order to know whether the record is insufficient to address assertions on direct appeal that trial counsel was ineffective, appellate counsel must assign and argue deficiency with enough particularity (1) for an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) for a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court.[47] When a claim of ineffective assistance of trial counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel.[48]

---

[44] *State v. Lierman, supra* note 13.

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id.*

## (c) Discussion

### *(i) Limiting Instruction*

Devers argues that trial counsel was ineffective for failing to object to the allegedly deficient limiting instruction that misdescribed the evidence of controlled substances. He contends that at trial, the district court limited the evidence to "marijuana," but that Hanson's testimony included evidence of synthetic marijuana, methamphetamine, and packing materials. The claim is sufficiently alleged, and the record is sufficient to review it.

Regarding the admission of evidence of controlled substances, the record shows that the district court gave two limiting instructions. While the original instruction restricted the jury to consider only the evidence of "marijuana" to corroborate witness testimony, the final jury instruction encompassed evidence of all controlled substances. As we previously determined, the limiting instructions, taken as a whole, removed any prejudice regarding the additional controlled substances. We conclude that this argument is without merit.

### *(ii) Motion to Dismiss*

Devers argues that trial counsel erred in failing to present evidence that he asserted his constitutional right to a speedy trial early and often in communications with his counsel. Devers further argues that counsel was ineffective for failing to file an interlocutory appeal from the denial of his motion to dismiss. We agree with the State that this claim is sufficiently alleged and that the record is sufficient to review it.

Devers' first argument addresses only a purported failure to present evidence on his constitutional speedy trial claim. The State argues that counsel was not ineffective for failing to produce evidence to support Devers' motion, because Devers did not argue to the district court that he asserted his constitutional right early and often in communications with counsel.[49] Even if we assume that the State's argument

---

[49] See *Johnston v. Mahally*, 348 F. Supp. 3d 417 (E.D. Pa. 2018).

is incorrect, Devers was not prejudiced. The district court analyzed Devers' constitutional speedy trial claim and found no unreasonable delay or prejudice. We agree and find that Devers' trial counsel's actions did not prejudice Devers; thus, his claim lacks merit.

Devers' second argument also fails. As the U.S. Supreme Court has stated, "application of the principles articulated in [*Cohen v. Beneficial Loan Corp.*[50]] and [*Abney v. United States*[51]] to [constitutional] speedy trial claims compels the conclusion that such claims are not appealable before trial."[52] Because denial of a motion to dismiss based upon a constitutional speedy trial claim is not a final, appealable order, Devers' argument lacks merit.

### (iii) Corrections Officer Hall

Devers argues trial counsel was ineffective for failing to present testimony from "Corrections Officer Hall," who would have testified that "upon learning that Stockdale would be moved into [Devers'] cell, Devers became irate due to his belief . . . Stockdale would use the opportunity to fabricate incriminating statements by Devers in an effort to obtain leniency,"[53] and that Corrections Officer Hall informed Devers he would have to lock Devers down because Devers was so upset about Stockdale's being moved into his cell. The claim is sufficiently alleged, and the record is sufficient to review part of the claim.

Devers' argument that Corrections Officer Hall would testify that Devers believed that Stockdale would fabricate incriminating evidence is without merit. First, Corrections Officer

---

[50] *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 69 S. Ct. 1221, 93 L. Ed. 1528 (1949).

[51] *Abney v. United States*, 431 U.S. 651, 97 S. Ct. 2034, 52 L. Ed. 2d 651 (1977).

[52] *United States v. MacDonald*, 435 U.S. 850, 861, 98 S. Ct. 1547, 56 L. Ed. 2d 18 (1978).

[53] Brief for appellant at 46.

Hall would not be able to testify to Devers' personal beliefs, pursuant to Neb. Rev. Stat. § 27-603 (Reissue 2016). And any statements that Devers made to Corrections Officer Hall would be inadmissible hearsay, pursuant to Neb. Rev. Stat. § 27-801 (Reissue 2016). Accordingly, the claim is without merit.

The record is insufficient to address the claims concerning observations that Corrections Officer Hall made when Devers received the news that Stockdale would be his cellmate and concerning any statements Corrections Officer Hall made to Devers.

### (iv) Remaining Claims

The State concedes that the remaining claims of ineffective assistance of counsel, not addressed above, are sufficiently alleged, but the record is insufficient to review them. We need not address them further.

## V. CONCLUSION

We conclude that the district court did not err in overruling Devers' motions in limine and did not err in admitting evidence of controlled substances from Devers' home and evidence of the firearm seized at Benson Towers. We also conclude that the admission of a sole reference to "multiple packages of marijuana" was, at most, harmless error. Viewing the evidence in the light most favorable to the State, we further conclude that the evidence at trial supported Devers' convictions. Finally, we conclude that the assignments of ineffective assistance of counsel that we reach on direct appeal lack merit. Accordingly, we affirm Devers' convictions and sentences.

Affirmed.

Cassel, J., concurring.

In numerous decisions, this court has determined that an allegation of ineffective assistance of trial counsel, asserted by new appellate counsel, was not stated with sufficient specificity where it failed to allege the name of the witness who would have testified and the specific content of the witness'

proposed testimony.[1] This naturally followed from this court's holding that an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel when raising an ineffective assistance claim on direct appeal.[2] As this court stated, "[g]eneral allegations . . . are insufficient . . . ."[3]

But this court has not insisted upon a specification of the name of a purported *expert* witness, where the allegation of ineffective assistance of trial counsel asserts a failure to adduce expert testimony for a particular opinion or conclusion.[4] And here, perhaps because of our case law, the State conceded that allegations of ineffective assistance for failing to "consult or call as a witness an expert in pharmacology who would have testified that, on [the date of the events,] Milton's prescriptions affected her ability to both accurately form and recall memories"[5] and failing to "consult with, or call as a witness, an independent telecommunications expert because he or she would have testified that the cell phone evidence did not support the State's theory as to Devers' and Milton's movements on [the dates of the events]"[6] were "sufficiently alleged"[7] or "sufficiently stated."[8]

---

[1] See, e.g., *State v. Abdullah*, 289 Neb. 123, 853 N.W.2d 858 (2014); *State v. Marks*, 286 Neb. 166, 835 N.W.2d 656 (2013); *State v. McGhee*, 280 Neb. 558, 787 N.W.2d 700 (2010); *State v. Davlin*, 277 Neb. 972, 766 N.W.2d 370 (2009).

[2] See *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014).

[3] *Id*. at 770, 848 N.W.2d at 578.

[4] See, *State v. Mora*, 298 Neb. 185, 903 N.W.2d 244 (2017) (failure to retain unnamed expert witness to refute State's DNA evidence not deemed insufficiently specific); *State v. Filholm, supra* note 2 (failure to consult and present testimony of unnamed DNA expert witness not deemed insufficiently specific).

[5] Brief for appellant at 51.

[6] *Id*. at 52.

[7] Brief for appellee at 32.

[8] *Id*.

One might wonder whether an assignment of error on direct appeal regarding an unnamed expert is sufficiently specific. In posing this question, I emphasize that I am not criticizing appellate counsel here—either for the degree of specificity of Devers' assignment or for the State's concession.

Several principles are settled: A criminal defendant has the right to the effective assistance of appellate counsel in his or her first appeal as of right.[9] There is no federal or state constitutional right to an attorney in state postconviction proceedings.[10] When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record.[11]

These principles collectively teach that where appellate counsel is different from trial counsel, the state and federal Constitutions provide a defendant only one opportunity for the assistance of counsel in framing allegations of ineffective assistance of trial counsel.

Might one then expect that appellate counsel should craft such allegations at least in accordance with the standard used to measure deficient performance? To show deficient performance, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.[12] Should it then follow that such ordinary training and skill includes evaluating the need for expert testimony and determining whether such testimony can be secured? And

---

[9] See, *Halbert v. Michigan*, 545 U.S. 605, 125 S. Ct. 2582, 162 L. Ed. 2d 552 (2005); *Pennsylvania v. Finley*, 481 U.S. 551, 107 S. Ct. 1990, 95 L. Ed. 2d 539 (1987); *Evitts v. Lucey*, 469 U.S. 387, 105 S. Ct. 830, 83 L. Ed. 2d 821 (1985); *Ross v. Moffitt*, 417 U.S. 600, 94 S. Ct. 2437, 41 L. Ed. 2d 341 (1974); *Douglas v. California*, 372 U.S. 353, 83 S. Ct. 814, 9 L. Ed. 2d 811 (1963).

[10] *State v. Custer*, 298 Neb. 279, 903 N.W.2d 911 (2017).

[11] *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020).

[12] *State v. Sierra*, 305 Neb. 249, 939 N.W.2d 808 (2020).

if there is an expert witness who would testify to a specific proposition, might it demand that appellate counsel locate and name the expert?

This could mean that more time may be required to prepare and submit a brief on direct appeal where appellate counsel is different from trial counsel. But is this not merely a necessary consequence of an important principle: The need for finality in the criminal process requires that a defendant bring all claims for relief at the first opportunity.[13]

In an appropriate case, this court should consider whether allegations of trial counsel's deficient performance regarding a potential expert witness' testimony are sufficient without naming the expert. The matter was not raised in the case decided today. If it is raised in the future, it deserves this court's attention.

---

[13] *State v. Phelps*, 286 Neb. 89, 834 N.W.2d 786 (2013).