IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. VAN LOON

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

DAVANTE L. VAN LOON, APPELLANT.

Filed December 27, 2022.    No. A-21-937.

Appeal from the District Court for Washington County: JOHN E. SAMSON, Judge. Affirmed.

Kenneth Jacobs, of Hug and Jacobs, L.L.C., for appellant.

Douglas J. Peterson, Attorney General, and Jordan Osborne for appellee.

PIRTLE, Chief Judge, and ARTERBURN and WELCH, Judges.

PIRTLE, Chief Judge.

## INTRODUCTION

Following a jury trial in the district court for Washington County, Davante L. Van Loon was found guilty on five counts of child abuse and sentenced to an aggregate of 18 to 44 years of incarceration. On appeal, Van Loon challenges the sufficiency of the evidence on each count and argues that the district court imposed an excessive sentence. Van Loon further raises, through new counsel, six claims of ineffective assistance of trial counsel. For the reasons that follow, we affirm.

## BACKGROUND

The criminal charges in this case arose out of a child abuse investigation that began in the evening hours of March 26, 2019. Shortly after 4 p.m. on that day, a home daycare provider, Morgan Lee, sent a text message to Rana M. notifying her of an apparent injury to one of Rana's children, whom we shall refer to as J.M. throughout this opinion. J.M. was roughly 7 months old at the time, and he was not yet able to walk or talk. Rana promptly picked her two children up

- 1 -

from Lee's residence and transported J.M. to the emergency room. Rana recalled that J.M. appeared to be experiencing severe pain in his right arm, and it was later determined that J.M. suffered an "acute" and "displaced" bone fracture near his right elbow.

Due to suspicions of child abuse, J.M. was transferred to Children's Hospital in Omaha (Children's) for a higher level of care. Dr. Juan Juarez, a physician specializing in pediatric emergency medicine at Children's, testified that he assumed care of J.M. upon his transfer to Children's and conducted a comprehensive medical evaluation, which included an x ray of all the bones in J.M.'s body. Juarez's evaluation revealed a number of additional suspicious injuries not explained by J.M.'s medical history. In addition to the acute displaced right arm fracture, J.M. had also suffered an acute nondisplaced fracture to the upper portion of his left arm, a healing "spiral fracture" to his left leg, bruising to his genitals, and a torn frenulum, which is the connective tissue under the tongue. With the exception of the frenulum tear, none of these injuries had been previously reported.

Dr. Lincoln Wong, a pediatric radiologist involved in J.M.'s care at Children's, testified that "acute" means a new fracture that does not show any signs of healing, and "displaced" means that the bone fragments actually separated from one another. Wong further testified that an acute fracture is generally considered to have occurred within 10 days of discovery, as signs of healing normally appear between 10 and 14 days after injury. Accordingly, a "healing" fracture is generally considered to have occurred at least 10 to 14 days prior to discovery. Wong indicated that it is difficult to determine the precise age of a healing fracture, but he estimated that the healing fractures in this case probably occurred within 21 days of discovery.

With the exception of the frenulum tear, Rana and Lee both testified that J.M. showed no signs of injury and demonstrated no discomfort when he was dropped off on the morning of March 26, 2019. The tear to J.M.'s frenulum was first observed by Lee and brought to Rana's attention about a week prior on March 21, 2019. Rana recalled that Van Loon was present in the home when Lee reported the injury and it was not clear how the injury occurred. Rana did not seek medical attention, as she initially thought J.M. simply scratched himself. However, Dr. Suzanne Haney, a pediatric child abuse expert involved in J.M.'s care at Children's, opined that the frenulum injury was not an injury that J.M. could have reasonably inflicted upon himself. Haney explained that the injury occurs when a hard object is "forcibly shoved" into the child's mouth. Both Haney and Juarez opined that such an injury is indicative of child abuse.

With respect to the bruising to J.M.'s genitals, Rana recalled observing similar bruising a week or two prior to March 26, 2019. At that time, Rana thought the bruising was from J.M. jumping too much in a bouncer, so she postulated that the bruising discovered on March 26 could have similarly been caused by the bouncer. However, Haney opined that the bruising to J.M.'s genitals would have required a significant amount of force inconsistent with a self-inflicted injury from jumping in a bouncer. Haney further opined that it was "very unlikely" that another child could have inflicted the bruising.

With respect to the acute displaced fracture to J.M.'s right arm, Haney explained that "the amount of force required to cause this would have been so excessive that whoever did it would have known," yet no reasonable explanation for the injury was provided. J.M. ultimately required surgery to repair the injury and Haney opined that the injury could have caused permanent disfigurement without surgery. With respect to the acute fracture to J.M.'s left arm, Haney again

noted the significant degree of force required to cause such an injury. However, unlike the displaced fracture to the right arm, Haney opined that the left arm would likely heal well without significant medical intervention. Finally, Haney testified that the spiral fracture to J.M.'s left leg would have been caused by taking ahold of the knee and twisting the ankle with significant force. Treatment of the spiral fracture required J.M.'s left leg to be immobilized in a hard cast for around a month. Altogether, given the number and nature of J.M.'s injuries, along with J.M.'s age and the lack of explanation as to the cause of the injuries, Juarez, Wong, and Haney all opined with a reasonable degree of medical certainty that J.M.'s injuries were not accidental and were inflicted as a result of abuse.

Rana testified that her children started going to Lee's for daycare on or about February 18, 2019. Prior to Lee's, Rana's children attended daycare in the home of Jennice Reid-Hansen beginning in early January 2019. Reid-Hansen testified that she never noticed any signs of injury or abuse during the roughly 1 month that J.M. attended daycare in her home. Reid-Hansen ceased providing daycare services to care for a new foster child with heightened needs. Lee's two children had also been attending daycare at Reid-Hansen's, so both Rana and Lee were in need of child care. Lee decided to open her own home daycare service, and Rana started sending her children to Lee's shortly thereafter.

Rana testified to her understanding that Van Loon would not be involved in the supervision of her children. Rana recalled sometimes seeing Van Loon at the home when she dropped off or picked up the children, but she assumed Van Loon was at work during the day. However, Lee testified that Van Loon had been off work due to bad weather for roughly 2 weeks leading up to March 26, 2019. While Lee testified that Van Loon often left the house even when he was off work, she also confirmed that Van Loon had repeated, and sometimes unsupervised, access to J.M. and the other children during that time. Moreover, Lee confirmed that Van Loon was home for a number of hours on March 26, 2019, and had substantial contact with J.M. on that day. Law enforcement conducted an interview with Van Loon in the early morning hours of March 27, which ultimately led law enforcement to suspect that Van Loon had inflicted J.M.'s injuries.

Van Loon's interview with law enforcement was video and audio recorded, which recording was admitted into evidence. Van Loon also provided a written statement which was likewise admitted into evidence. Law enforcement detective, Russ Cook, conducted the interview and testified at trial to his observations of Van Loon as it relates to the child abuse investigation. Cook noted that Van Loon had an "odd" reaction when Cook described the extent of J.M.'s injuries. "[Van Loon] placed his hand over his mouth and became silent for a very long period of time." Van Loon confirmed that he had contact with J.M. on March 26, 2019, and on prior occasions, including at least one occasion in which Van Loon tried to feed J.M. a bottle but J.M. refused to eat.

As far as possible explanations for J.M.'s injuries, Van Loon reported that on or about March 18, 2019, he lost his balance while climbing over a baby gate and fell on J.M., possibly injuring J.M.'s upper left leg and lower left arm. Van Loon further reported that on March 21, he was "play walking" with J.M., holding J.M. upright by his armpits, when Van Loon got distracted and lost his grip causing J.M. to fall to the floor. Haney testified that the March 18 incident could have possibly caused the fracture to J.M.'s upper left arm, but it would not explain the totality of

J.M.'s injuries. Haney further opined that the March 21 incident as described by Van Loon would not have caused any of J.M.'s injuries.

At trial, there was no dispute that Van Loon was present in the home on the morning of March 26, 2019, after J.M. arrived. It was further undisputed that Van Loon left the home at some point in the day and returned between 4 and 5 p.m. In Van Loon's recorded interview, he first indicated that he had only a brief interaction with the children before leaving for Omaha around 9:30 a.m. to see a friend. However, a few minutes later, Van Loon recalled that he was actually still present when Lee was making lunch for the children, and Lee testified that she usually served lunch around 11 a.m. According to Van Loon, it was around that time that he noticed J.M. was fussy, so he swaddled J.M. in a blanket and passed J.M. to Lee.

Similarly, Lee initially testified that Van Loon left the house between 9 and 10 a.m. However, upon further questioning, she likewise recalled that Van Loon was still home around 11 a.m. and may have even been home as late as 1:30 p.m. Lee ultimately testified that she could not recall when Van Loon left the house that day. Lee recalled that she asked Van Loon to pick up J.M. while she was helping the other children with lunch, and Van Loon walked around with J.M. for some time, eventually swaddling J.M. in a blanket. At some point after lunch, while the other children were napping, Lee testified that she took J.M. from Van Loon, and Van Loon left the house. Van Loon then returned between 4 and 5 p.m., as Rana recalled that Van Loon approached her while she was loading the children in her car and asked that Rana keep him and Lee updated on J.M.'s condition. Rana testified that she found this strange because she did not normally discuss the children with Van Loon.

On December 17, 2019, the State filed an amended information charging Van Loon with five counts of child abuse. Count 1 alleged intentional child abuse resulting in serious bodily injury and pertained to the acute displaced fracture to J.M.'s right arm. Count 2 alleged intentional child abuse resulting in serious bodily injury and pertained to the acute nondisplaced fracture to J.M.'s left arm. Near the end of trial, the court sustained in part Van Loon's motion for directed verdict on count 2 because the State failed to prove that the left arm fracture constituted serious bodily injury. Thus, count 2 was presented to the jury as a charge of intentional child abuse not resulting in serious bodily injury. Count 3 alleged intentional child abuse not resulting in serious bodily injury and pertained to J.M.'s torn frenulum. Count 4 alleged intentional child abuse not resulting in serious bodily injury and pertained to the bruising to J.M.'s genitals. Count 5 alleged intentional child abuse resulting in serious bodily injury and pertained, at least initially, to a number of additional fractures in various stages of healing. The State ultimately limited the allegations in count 5 to the spiral fracture to J.M.'s left leg. The jury was further instructed on the lesser-included charge of negligent child abuse on each count.

After trial and deliberations, the jury found Van Loon guilty of intentional child abuse resulting in serious bodily injury as alleged in counts 1 and 5, intentional child abuse not resulting in serious bodily injury as alleged in counts 2 and 4, and negligent child abuse not resulting in serious bodily injury as a lesser-included crime of the allegations in count 3. Counts 1 and 5 carried a maximum punishment of 50 years in prison, counts 2 and 4 carried a maximum punishment of 3 years in prison, and count 3 carried a maximum punishment of not more than 1 year in prison. See, Neb. Rev. Stat. § 28-707 (Reissue 2016); Neb. Rev. Stat. § 28-105 (Reissue 2016); Neb. Rev. Stat. § 28-106 (Reissue 2016).

Following a presentence investigation, the district court sentenced Van Loon to a term of 18 to 44 years of incarceration on counts 1 and 5, which sentences were to be served concurrently. The court further sentenced Van Loon to lesser concurrent terms of incarceration on counts 2 through 4, such that Van Loon's aggregate sentence was 18 to 44 years of incarceration. Van Loon appealed.

## ASSIGNMENTS OF ERROR

Van Loon assigns, restated, that the district court erred in (1) accepting the jury verdict based on insufficient evidence and (2) imposing an excessive sentence. Van Loon further raises six claims of ineffective assistance of counsel.

## STANDARD OF REVIEW

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, and such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Bryant*, 311 Neb. 206, 971 N.W.2d 146 (2022).

A sentence imposed within the statutory limits will not be disturbed on appeal in the absence of an abuse of discretion by the trial court. *State v. Greer*, 312 Neb. 351, 979 N.W.2d 101 (2022). A judicial abuse of discretion exists only when the reasons or rulings of the trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. *Id.*

The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved on direct appeal; the determining factor is whether the record is sufficient to adequately review the question. *State v. Blake*, 310 Neb. 769, 969 N.W.2d 399 (2022). The record is sufficient to resolve on direct appeal a claim of ineffective assistance of counsel if the record affirmatively proves or rebuts either deficiency or prejudice with respect to the defendant's claims. *Id.*

## ANALYSIS

*Sufficiency of Evidence.*

Van Loon's first assignment of error challenges the sufficiency of the evidence in support of his conviction. Van Loon does not dispute the extent of J.M.'s injuries nor the expert medical testimony that such injuries were the result of nonaccidental abuse. Neither does Van Loon dispute that he had access to J.M. both on March 26, 2019, and on prior occasions in the month leading up to that date. Rather, Van Loon's central argument on appeal is that the State failed to prove that Van Loon, as opposed to some other individual, was the perpetrator of abuse. Van Loon argues "There were numerous other individuals who all had the same amount of access to J.M. as [Van Loon] and nothing other than a tunnel vision to convict [Van Loon] was presented." Brief for appellant at 23. In this way, Van Loon suggests that the evidence pointed to numerous possible perpetrators and the State simply identified the wrong one. However, our standard of review does

not permit us to reverse Van Loon's convictions simply because the State failed to definitively exclude other possible perpetrators. Rather, we are tasked with viewing the evidence in the light most favorable to the prosecution and determining whether any rational jury could have concluded that Van Loon inflicted J.M.'s injuries.

Count 1 alleged that Van Loon intentionally inflicted the acute displaced fracture to J.M.'s arm on or about March 26, 2019. The record reflects that Van Loon was present in the home that morning and he was also present when Rana picked up the children between 4 and 5 p.m. While there was evidence that Van Loon left the home for a period of time, the record reflects that he was present long enough to have sustained contact with J.M. prior to leaving. J.M. showed no signs of injury or discomfort when he was dropped off at Lee's residence that morning, yet the acute displaced right arm fracture was apparent when J.M. was picked up. The record reflects that Lee and Van Loon were the only adults with access to J.M. during that time, and neither of them provided any reasonable explanation for J.M.'s injury. Viewing the evidence in the light most favorable to the prosecution, a rational jury could have found that Van Loon intentionally inflicted the acute displaced right arm fracture on or about March 26, 2019.

Count 2 alleged that Van Loon intentionally inflicted the acute fracture to J.M.'s left arm on or about February 18, 2019, through March 27, 2019. As an acute fracture, it was estimated that J.M. sustained the fracture within 10 days of its discovery on March 26, and it could have occurred on March 26 along with the right arm fracture. There was no dispute that Van Loon had access to J.M. on multiple occasions during that period of time. While Haney testified that this injury could have possibly been explained by Van Loon's report of accidentally falling on J.M., such report was not consistent with the totality of J.M.'s injuries. Viewing the evidence in the light most favorable to the prosecution, a rational jury could have found that Van Loon intentionally inflicted the acute fracture to J.M.'s left arm on or about February 18 through March 27.

Count 3 alleged that Van Loon intentionally inflicted the tear to J.M.'s frenulum on or about March 21, 2019. Lee reportedly noticed the injury shortly after J.M. arrived at her residence on March 21 and promptly notified Rana. Rana testified she initially thought J.M. could have scratched himself, but Haney opined that that was not a reasonable explanation for the injury, as that injury usually occurs when a hard object is forcibly pushed into a child's mouth. There was evidence that Van Loon had access to J.M. on March 21 at the time the injury was reported, and Van Loon recalled unsuccessfully attempting to feed J.M. on at least one occasion. The jury ultimately found Van Loon guilty of the lesser-included offense of negligently inflicting the injury. Viewing the evidence in the light most favorable to the prosecution, a rational jury could have found that Van Loon negligently inflicted the tear to J.M.'s frenulum on or about March 21.

Count 4 alleged that Van Loon intentionally inflicted the bruises to J.M.'s genitals on or about February 18, 2019, through March 27, 2019. Once again, J.M. showed no signs of injury on the morning of March 26, yet the bruising was apparent when J.M. was evaluated later that evening. As with count 1, the record reflects that Van Loon had access to J.M. on March 26, and neither Van Loon nor Lee provided any reasonable explanation for the injury. Rana recalled observing similar bruising on J.M. in the past, and she thought it was from J.M. jumping too much in a bouncer. However, Haney opined that that was not a reasonable explanation, rendering the reappearance of bruising on March 26 more suspicious. Viewing the evidence in the light most

favorable to the prosecution, a rational jury could have found that Van Loon intentionally inflicted the bruising to J.M.'s genitals on or about February 18 to March 27.

Finally, count 5 alleged, as limited after trial, that Van Loon intentionally inflicted the healing spiral fracture to J.M.'s left leg on or about February 18, 2019, through March 27, 2019. It was estimated that J.M. sustained the fracture between 10 and 21 days of discovery on March 26. As with the foregoing counts, the record reflects that Van Loon had access to J.M. on multiple occasions during that period of time. Haney explained that the spiral fracture would have been caused by someone taking ahold of the knee and twisting the ankle with significant force. Viewing the evidence in the light most favorable to the prosecution, a rational jury could have concluded that Van Loon intentionally inflicted the healing spiral fracture to J.M.'s left leg on or about February 18 through March 27.

The thread tying each of the counts together is that J.M. sustained a number of extremely suspicious injuries during a period of time in which Van Loon had repeated access to J.M., and no party provided any reasonable explanation to account for the totality of J.M.'s injuries. There was no evidence that J.M. had suffered similar injuries prior to or after that period of time, and multiple medical experts opined that J.M.'s injuries were the result of nonaccidental abuse. The Nebraska Supreme Court has previously observed that the evidence in child abuse prosecutions is often largely circumstantial and need not establish exclusive custody or care to support a conviction. See *State v. Olbricht*, 294 Neb. 974, 885 N.W.2d 699 (2016). The evidence in the present case made clear that J.M. was the victim of abuse and Van Loon was one possible perpetrator. Having heard the evidence and observed the witnesses, a rational jury could have concluded that Van Loon had inflicted the totality of J.M.'s injuries and thus convicted him on all five counts.

*Excessive Sentence.*

Van Loon next assigns that the district court imposed an excessive sentence. Van Loon does not dispute that his sentences were well within the statutory limits. Rather, Van Loon argues that his "mentality" and his actions after being convicted weighed in favor of a more lenient sentence. A number of character witnesses testified at the sentencing hearing on Van Loon's behalf and described a positive relationship between Van Loon and his two children. Furthermore, Van Loon pointed to his role in starting an "addiction therapy group" for fellow inmates and serving as a "trustee" at the jail while awaiting sentencing. In light of these facts, Van Loon argued that the sentence imposed by the district court was an abuse of discretion.

The State counters that all of the information cited by Van Loon was available to the district court at the time of sentencing and that the court appropriately weighed the required factors. The State points to various risk factors identified in the presentence investigation, including a "medium high" risk to reoffend and Van Loon's criminal history. Brief for appellee at 39. In pronouncing the sentence, the district court explicitly noted the various sentencing factors and acknowledged the character witnesses that testified on Van Loon's behalf. Having weighed and balanced the appropriate factors, the district court determined that a lengthy term of imprisonment was necessary. Upon our review of the record, we cannot say the sentence imposed by the district court amounted to an abuse of discretion. See *State v. Harrison*, 255 Neb. 990, 588 N.W.2d 556 (1999) (sentence not abuse of discretion so long as within statutory limits, supported by competent evidence, and not based on irrelevant considerations).

*Ineffective Assistance of Counsel.*

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. John*, 310 Neb. 958, 969 N.W.2d 894 (2022). To show that counsel's performance was deficient, the defendant must show counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law in the area. *Id.* To show prejudice under the prejudice component of the *Strickland* test, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different. *Id.*

Van Loon first claims that trial counsel was ineffective for proceeding to a jury trial despite knowledge that Lee had previously been acquitted in a bench trial on charges also arising out of J.M.'s injuries. Van Loon asserts, albeit without evidence, that he requested to waive his right to a jury trial and proceed to a bench trial but that trial counsel refused. Van Loon argues that his conviction in and of itself demonstrates prejudice because he suggests that a bench trial would have resulted in an acquittal. The State counters that Van Loon cannot show a reasonable probability of acquittal if the case had been tried to the court instead of a jury, and we agree. Thus, we conclude there is no merit to Van Loon's first claim of ineffective assistance of counsel.

Van Loon's second and third claims allege that trial counsel was ineffective in the cross-examination of Rana and law enforcement sergeant, Kelly McManigal, respectively. With respect to Rana, Van Loon points out an apparent inconsistency between her trial testimony and her testimony in a separate trial. Specifically, Rana had previously testified that when she arrived at Lee's residence to pick up J.M. on March 26, 2019, J.M. was initially silent and only started crying when his arm was touched. In contrast, Rana's trial testimony indicated that J.M. was crying inconsolably immediately upon her arrival. Van Loon argues that Rana's trial testimony "seemed to inflate the injury to J.M.," making it more likely for the jury to conclude that J.M.'s right arm fracture occurred on March 26, as opposed to a previous day. Brief for appellant at 29. Thus, Van Loon argues that trial counsel was ineffective for failing to expose this inconsistency to the jury.

However, Van Loon cannot show prejudice because the evidence clearly established that J.M.'s right arm fracture was sustained on March 26 during the time that J.M. was at Lee's residence. Both Lee and Rana testified that J.M. showed no signs of injury or discomfort that morning, yet, J.M. was clearly injured and in obvious pain when Rana arrived to pick him up. This is further corroborated by the expert medical testimony that the fracture to J.M.'s right arm was an acute fracture that would have caused significant and obvious pain. Trial counsel's failure to expose this inconsistency in Rana's testimony did not create a reasonable probability of a different outcome, and there is no merit to Van Loon's second claim of ineffective assistance of counsel.

Van Loon similarly points to an apparent inconsistency between McManigal's trial testimony and his testimony in a separate trial. Specifically, McManigal previously testified that he had been involved in approximately 20 child abuse cases. Yet, at trial, McManigal testified that he had been involved in "about a hundred plus" child abuse cases. Van Loon argues that McManigal's trial testimony improperly bolstered law enforcement's identification of Van Loon as the perpetrator of abuse. However, the State counters that McManigal was only minimally

involved in the investigation and was not involved in the identification of Van Loon as the perpetrator. Indeed, McManigal testified that Van Loon was identified as the perpetrator immediately after the interview conducted by Cook, and McManigal did not even know the basis for Cook's conclusion. Whether or not McManigal inflated the number of child abuse cases he had worked on, such could not have improperly bolstered a determination in which McManigal played no part. Trial counsel's failure to expose the inconsistency in McManigal's testimony did not create a reasonable probability of a different outcome, and there is no merit to Van Loon's third claim of ineffective assistance of counsel.

Van Loon's fourth and fifth claims allege that trial counsel was ineffective for failing to investigate and call certain witnesses. When the claim of ineffective assistance of counsel on direct appeal involves uncalled witnesses, it is sufficient that appellate counsel give the names or descriptions of any uncalled witnesses forming the basis of a claim of ineffective assistance of trial counsel. See *State v. Blake*, 310 Neb. 769, 969 N.W.2d 399 (2022). However, the appellate court does not need specific factual allegations as to what the person or persons would have said, which will not be found in the appellate record. *Id.* Such specificity is necessary so that the postconviction court may later identify whether a particular claim of failing to investigate a witness is the same one that was raised on direct appeal. *Id.*

Van Loon's fourth claim challenges trial counsel's failure to call employees of the Department of Health and Human Services (DHHS) to testify. We conclude that Van Loon has raised this claim with sufficient specificity, however, the record is silent as to the substance of the uncalled DHHS employees' testimony or how such testimony would have aided Van Loon's defense. Accordingly, we conclude that Van Loon has preserved this claim for postconviction review, but the record is insufficient to resolve the claim on direct appeal.

Van Loon's fifth claim alleges that trial counsel was ineffective for failing to investigate and call an alibi witness identified as AJ Kamphous. Van Loon argues that Kamphous could have shed light on the period of time that Van Loon was not present in the house on March 26, 2019. Having identified Kamphous by name, Van Loon has raised the claim with sufficient specificity to preserve it for postconviction relief. However, we conclude that Van Loon cannot show prejudice because the evidence, including Van Loon's recorded interview and Lee's testimony, clearly established that Van Loon was present in the home for a substantial period of time on March 26 and had contact with J.M. prior to leaving for a period of time. Even if Kamphous had fully corroborated the account of events provided by Van Loon and Lee, the evidence would have nevertheless established adequate opportunity for Van Loon to harm J.M. prior to leaving the home. Accordingly, trial counsel's failure to investigate or call Kamphous regarding Van Loon's whereabouts on March 26 did not create a reasonable probability of a different outcome and Van Loon's fifth claim of ineffective assistance of counsel is without merit.

Finally, Van Loon's sixth claim alleges that trial counsel was ineffective for failing to consult with and call an expert witness to rebut the State's medical experts. Van Loon argues that counsel should have consulted a "biomechanical engineer" to counter the expert medical testimony offered by the State. Brief for appellant at 35. Van Loon does not in any way identify a specific expert witness that counsel failed to consult. Rather, Van Loon simply concludes that the failure to obtain a rebuttal expert was constitutionally deficient performance.

While it is clear from *State v. Blake, supra*, that a claim regarding uncalled lay witnesses must include names or descriptions thereof, it does not appear that claims regarding the failure to consult an expert witness demand the same level of specificity. See, *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021); *State v. Devers*, 306 Neb. 429, 945 N.W.2d 470 (2020); *State v. Mora*, 298 Neb. 185, 903 N.W.2d 244 (2017); *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014). In each of these cases, appellant raised, on direct appeal, a claim of ineffective assistance for failure to consult with an appropriate expert witness. Furthermore, in each case, appellant failed to name or describe a specific expert witness forming the basis of the claim. Nevertheless, the court found each of those claims to be adequately raised on direct appeal. In *Devers*, Justice Cassel wrote a concurring opinion noting that the State had simply conceded, "perhaps because of our case law," that claims regarding the failure to consult an expert witness were adequately raised. *State v. Devers*, 306 Neb. at 458, 945 N.W.2d at 491 (Cassel, J., concurring). As such, there was no need to address the matter in that case, but Justice Cassel encouraged the court to, in a proper case, more directly address "whether allegations of trial counsel's deficient performance regarding a potential expert witness' testimony are sufficient without naming the expert." *Id.* at 460, 945 N.W.2d at 492. In this case, we conclude that Van Loon has raised his sixth claim of ineffective assistance with sufficient specificity to preserve the claim for postconviction review, but the record is insufficient to resolve the claim on direct appeal.

CONCLUSION

For the foregoing reasons, we affirm Van Loon's convictions and sentences. We conclude that Van Loon's first, second, third, and fifth claims of ineffective assistance of counsel are affirmatively refuted by the record because Van Loon cannot show prejudice. With respect to Van Loon's fourth and sixth claims of ineffective assistance, we conclude the record is insufficient to resolve the claims on direct appeal but that Van Loon has preserved them for postconviction review.

AFFIRMED.